**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CHETCO RESOURCES, LLC, et al., | ) Case Nos. 22-1568; 22-1569 |
| | ) (consolidated) |
| Plaintiffs, | ) |
| | ) Senior Judge Loren A. Smith |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**<u>UNITED STATES' MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, the United States of America, moves for summary judgment on all claims

asserted in Plaintiffs' Complaints, ECF No. 1, under Rule 56(a) of the Rules of

the United States Court of Federal Claims.

Dated: March 26, 2026

<div style="margin-left:45%">

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

<u>/s/  Samuel R. Vice</u>
SAMUEL R. VICE (CA Bar No. 324687)
Trial Attorney
JOHN P. TUSTIN (TX Bar No. 24056458)
Senior Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 353-5540 (Vice)
(202) 598-3543 (Tustin)
email: samuel.vice@usdoj.gov
email: john.tustin@usdoj.gov

*Counsel of Record for the United States*

</div>

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND .................................................................................................2

    I.       Statement of Facts .......................................................................................2

          A.       The 2017 Chetco Bar Fire ...............................................................2

                1.       July 12-13: Initial discovery and direct attack to suppress the fire. ...................................................................................................3

                2.       July 13–August 16: Incident Management Teams implement an indirect suppression strategy. ............................................................5

                3.       August 16–21: Firefighters attempt to save life and property as the Chetco Effect Wind event causes explosive fire growth ...............................................................................................7

                4.       August 21 – November 2: Firefighting response continues through November until the fire is contained. ...............................12

          B.       Post Fire Reports ...........................................................................13

          C.       Plaintiffs' Properties .....................................................................14

    II.      Procedural History .....................................................................................16

STANDARD OF REVIEW ...................................................................................................16

ARGUMENT .........................................................................................................................17

    I.       Plaintiffs cannot meet their burden to prove causation. .............................18

          A.       To prove causation, Plaintiffs must show that, absent the government fire suppression efforts, their properties would not have burned. ..........................................................................................18

          B.       Summary judgment for the United States is required because Plaintiffs do not apply the correct causation standard. .............................19

          C.       There is no exception to causation for "per se" takings ............................21

    II.      Plaintiffs cannot show the United States managed the fire to achieve natural resource benefits. ..........................................................................................22

CONCLUSION ......................................................................................................................28

i

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Applegate v. United States*,
35 Fed. Cl. 406 (1996) .................................................................................................. 21

*Bd. of Supervisors of Issaquena Cnty., Miss. v. United States*,
84 F.4th 1359 (Fed. Cir. 2023) ..................................................................................... 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................. 17, 18

*Crater Corp. v. Lucent Techs., Inc.*,
255 F.3d 1361 (Fed. Cir. 2001) ..................................................................................... 17

*Dairyland Power Co-op. v. United States*,
16 F.3d 1197 (Fed. Cir. 1994) ....................................................................................... 18

*Ideker Farms, Inc. v. United States*,
71 F.4th 964 (Fed. Cir. 2023) .................................................................................. 20, 26

*Kingman Reef Atoll Dev., LLC v. United States*,
116 Fed. Cl. 708 (2014) ................................................................................................ 18

*McDonough Fam. Land, LP v. United States*,
172 Fed. Cl. 414 (2024) .................................................................................... 21, 22, 27

*Orr v. United States*,
166 Fed. Cl. 1 (2023) .................................................................................................... 22

*St. Bernard Par. Gov't v. United States*,
887 F.3d 1354 (Fed. Cir. 2018) ......................................................... 20, 22, 24, 27

*Strawberry Water Users Ass'n v. United States*,
No. 2:22-CV-00002-JNP-DAO, 2023 WL 2634333 (D. Utah Mar. 24, 2023) .................. 32, 33

**Statutes**

Or. Rev. Stat. § 476.520 .................................................................................................. 12

Or. Rev. Stat. §§ 476.510–610 ........................................................................................ 12

**Rules**

RCFC 56(a) ....................................................................................................................... 16

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | 2017 Chetco Bar Fire Timeline<br>US_CHETCO_0056793–56803 |
| 2 | GAO Report - Information on Forest Service Response, Key Concerns, and Effects of the Chetco Bar Fire<br>US_CHETCO_0069060–69125 |
| 3 | Meteorology Expert Report of Dr. John T. Abatzoglou (Jan. 24, 2025) |
| 4 | Long Term Assessment & Implementation Plan (Aug. 11, 2017)<br>US_CHETCO_0055476–55557 |
| 5 | Fire Behavior Expert Report of Mark A. Finney, Ph.D.<br>(Jan. 21, 2025 rev. June 2025) |
| 6 | August Fire Progression Maps |
| 7 | Facilitated Learning Analysis - Packer's Cabin Serious Near Miss<br>US_CHETCO_0047944–47960 |
| 8 | Chetco Bar Fire Evening Update for Aug. 17, 2017<br>US_CHETCO_0047846–47885 |
| 9 | Deposition Transcript of United States 30(b)(6) (Jonathon Teutrine) (July 26, 2024), excerpt |
| 10 | Deposition Transcript of Bob Houseman (Dec. 6, 2023), excerpt |
| 11 | Fire Behavior Expert Report of Brenda Wilmore (Jan. 24, 2025) |
| 12 | Activity Log from Aug. 18, 2017<br>US_CHETCO_0056474–56475 |
| 13 | South Coast Lumber Report authored by Dan Shults<br>CBMF 006049-6073 |
| 14 | Deposition Transcript of Tim Gibilisco (Dec. 8, 2023), excerpt |
| 15 | Deposition Transcript of Allan Blofsky (Dec. 4, 2013), excerpt |
| 16 | Deposition Transcript of Taijasa Corso (Dec. 7, 2023), excerpt |
| 17 | Deposition Transcript of Michael Brod (Dec. 4, 2023), excerpt |
| 18 | Executive Order No. 17-18, Invocation of Emergency Conflagration Act of 1940 |
| 19 | Worlton's Responses to U.S. 1st Discovery Requests, excerpt |
| 20 | Laursen's Responses to U.S. 1st Discovery Requests, excerpt |
| 21 | Brimm's Responses to U.S. 1st Discovery Requests, excerpt |
| 22 | Chetco's Responses to U.S. 1st Discovery Requests, excerpt |
| 23 | Pistol's Responses to U.S. 1st Discovery Requests, excerpt |
| 24 | 2017 Pacific Northwest Fire Narrative<br>US_CHETCO_0047961–48088 |
| 25 | U.S. 3rd Supplemental Responses to Chetco 1st Discovery Requests, excerpt |
| 26 | Deposition Transcript of Tina Lanier (Jan. 29, 2024), excerpt |
| 27 | Deposition Transcript of Dana Skelly (Dec. 5, 2023), excerpt |

| 28 | Deposition Transcript of Jason McGovern (March 21, 2024), excerpt |
|----|----|
| 29 | Deposition Transcript of United States 30(b)(6) (Dana Skelly) (July 25, 2024), excerpt |
| 30 | Incident Action Plans (July 15–20, 2017)<br>US_CHETCO_043371–43382 |
| 31 | Incident Action Plans (August 7–8, 2017)<br>US_CHETCO_043577–43593 |
| 32 | Chetco Bar Incident Decision (Aug, 23, 2017)<br>US_CHETCO_048136–48194 |
| 33 | U.S. Supplemental Response to Pistol 1st Discovery Requests |
| 34 | The National Strategy - Final Phase in Development of National Cohesive Wildland Fire management Strategy (April 2014)<br>CBMF 004448–4548 |
| 35 | USDA Forest Service Strategic Plan: FY2015–2020 (June 2015)<br>CBMF 005040–5099 |
| 36 | Chetco's 1st Supplemental Responses to U.S. 1st Discovery Requests, excerpt |

**INTRODUCTION**

In July 2017, a lightning-caused fire ignited deep in the remote Kalmiopsis Wilderness in southwest Oregon. The fire burned for nearly four months, ultimately consuming approximately 191,197 acres before it was fully contained. The Chetco Bar Fire's explosive growth was driven by a historically rare combination of record heat, critically low humidity, and a localized offshore wind phenomenon known as the Chetco Effect. Those historic conditions led to the fire growing from roughly 8,500 acres to over 91,000 acres in just four days. Six homes and dozens of structures were destroyed. Thousands of residents were evacuated. Oregon's Governor invoked emergency powers reserved for only the most severe fire events the threaten life and property.

Plaintiffs are landowners whose properties burned during those four days of historically extreme fire weather. They bring Fifth Amendment takings claims against the United States, alleging that the Forest Service's management decisions during the early days of the fire and the firing operations conducted to save structures and homes caused their properties to burn.

The Court should grant summary judgment to the United States on all claims. Plaintiffs' causation theory fails as a matter of law because it applies the wrong legal standard. The Federal Circuit is clear that a takings plaintiff must show that, absent all government action, the injury would not have occurred. They do not grapple with the full scope of the government's suppression response—the air tanker retardant drops, the helicopter water drops, the dozer lines, the handlines—nor do they contend with the question the law requires them to answer: whether their properties would have burned anyway had the Forest Service done nothing at all. That failure of proof is dispositive and requires no trial to resolve.

1

Additionally, partial summary judgment is warranted on Plaintiffs' theory that the Forest Service managed the Chetco Bar Fire to achieve natural resource benefit objectives. That theory is contradicted by uncontested testimony from every Forest Service official involved in the response and by every contemporaneous document in the record. The fire was managed as a full suppression fire from the moment it was detected. No material issue of fact exists on that question, and the Court should resolve it now.

<div align="center">

**FACTUAL BACKGROUND**

</div>

**I.      Statement of Facts**

**A.      The 2017 Chetco Bar Fire**

Lightning ignited the Chetco Bar Fire in July 2017 in the rugged Kalmiopsis Wilderness. Over the following months, it grew into one of the largest wildfires in Oregon history. The Forest Service's response unfolded in four phases. First, an initial direct attack on July 12 and 13 was attempted to put the fire out immediately, but was abandoned when steep terrain, dangerous fuels, and the absence of any safe escape route made continued engagement untenable. Second, from mid-July through August 15, incident management teams pursued an indirect suppression strategy, including building contingency lines along existing road systems while the fire remained within the Wilderness and was checked to the south by the Chetco River. Third, beginning on the evening of August 15, a localized wind phenomenon known as the Chetco Effect drove explosive growth and breached the contingency lines before planned burnout operations could be executed. As the fire expanded rapidly under the Chetco Effect, the Forest Service shifted to emergency protection of property and life, conducting defensive firing operations to defend structures and homes from the fire. Fourth, after the Chetco Effect Winds

<div align="center">

2

</div>

ended, weather moderated the fire's growth while the Forest Service continued suppression efforts through containment in November 2017.

### 1. July 12-13: Initial discovery and direct attack to suppress the fire.

The Chetco Bar Fire was first detected on July 12, 2017, by a commercial airline pilot flying over a remote area of the Kalmiopsis Wilderness on National Forest System lands in the Rogue River-Siskiyou National Forest (Forest) in southwest Oregon. US_CHETCO_0056793 (Exhibit 1); US_CHETCO_0069076 (Exhibit 2). When first detected, the fire was estimated to be 0.25 and 0.5 acres in size. US_CHETCO_0056793; US_CHETCO_0069076. The Forest Service was notified about the fire around 2:43 pm on July 12. US_CHETCO_0056793; US_CHETCO_0069076. Less than two hours later, four Forest Service firefighters rappelled from a helicopter into the steep and rugged terrain to assess the fire. US_CHETCO_0069076. The Forest Service firefighters attempted to create a helispot (a landing area for helicopter crews) by cutting trees and clearing brush. US_CHETCO_0069076.



Source: U.S. Forest Service.  |  GAO-20-424

**US_CHETCO_0069078 (photo showing steep terrain and helispot construction)**

3

Meanwhile, several helicopters dropped more than 17,000 of gallons of water to slow the spread of the fire to allow the rappelers to clear the helispot. US_CHETCO_0056793; US_CHETCO_0069076–77.

Efforts to create the helispot continued the next day with four additional rappeler reinforcements and more aerial water drops of thousands of gallons of water and about 1,375 gallons of fire retardant. US_CHETCO_0056794; US_CHETCO_0069077. The Forest Service also sent someone directly to the fire to map the perimeter and assess ground conditions. US_CHETCO_0056794. The Forest Service observed that because of the difficult and dangerous terrain, it took the hiker about half an hour to hike about one-third of a mile. *Id.* The fire was located on a 35% to 60% slope with a heavy component of dead and downed trees, making navigation extremely difficult. *Id.*

By the early afternoon of July 13, fire crew bosses estimated the Chetco Bar Fire had grown to about 15 acres and observed several spot fires (smaller fires separate from the main fire) caused by burning material rolling down the hill. US_CHETCO_0069078. Because of safety concerns for the rappelers on the ground, the incomplete helispot, lack of a safety zone or an escape route, and a low probability of success at containing the fire in that location, the Forest Service evacuated the firefighters by rappel helicopter, cancelled plans to bring in ground crew firefighters, and stopped aerial drops of water and retardant. US_CHETCO_0056795; US_CHETCO_0069078–79. All resources were off the fire by 4:38 pm. US_CHETCO_0056795. The rappel helicopter returned less than two hours later with the Type 3 Incident Command to do a reconnaissance flight. *Id.* The Type 3 Incident Command assumed control of the fire at 6:57 pm on July 13. *Id.*



**US_CHETCO_0056795 (photo from July 13 reconnaissance flight after firefighter evacuation)**

### 2. July 13–August 16: Incident management teams implement an indirect suppression strategy.

After the initial attack on July 13, the fire mangers determined that the Chetco Bar Fire would not be quickly contained. *Id.*; US_CHETCO_0069081. The next day, the Type 3 team assembled to formulate a management plan. US_CHETCO_0056795. Because the steep, rugged terrain of the Kalmiopsis Wilderness made direct engagement unsafe, the team shifted to indirect suppression strategies. *Id.*; US_CHETCO_0069081. Crews then began constructing primary firelines and scouting access points along the outer edge of the Wilderness. US_CHETCO_0069081. A burnout option along the Chetco River and a ridgeline trail system was discussed but ultimately rejected. The terrain offered no escape routes or safety zones, the risk of spotting across the river into heavy fuels was significant, and a failed burnout would have

5

significantly increased the fire's size, which were risks managers were not willing to accept. US_CHETCO_0056796.

Through late July, crews worked to clear and improve contingency lines using existing roads and trails, including lines built during the 2002 Biscuit Fire. US_CHETCO_0056797. Despite the effort, options to build lines closer to the fire were repeatedly rejected on safety grounds. *Id.* The region was also managing a mounting number of concurrent fires—15 burning on July 14, growing to 32 by August 16—which affected available resources. US_CHETCO_0069081.

By late July, Forest leadership brought in a National Incident Management Organization (NIMO) team to replace the Type 3 team, whose two-week rotation was ending. US_CHETCO_0069081–82. A NIMO team consists of Type 1-qualified personnel who can remain on a fire longer and develop complex, long-range plans. *Id.* The NIMO team assumed command on July 29 and immediately developed a detailed implementation plan identifying 13 management action points to guide decision-making as the fire grew. US_CHETCO_0069082. The most critical trigger was preventing the fire from crossing the Chetco River, with actions to deploy if it did. *Id.*

Through early August, the NIMO team continued the indirect suppression strategy. *Id.* The strategy included contingency lines built roughly six miles from the fire, primarily along the 1917 and 1909 road systems. US_CHETCO_0056797. A contingency line along the 1917 and 1909 roads from Vulcan Peak Trailhead was completed by August 17. US_CHETCO_0069082; US_CHETCO_0056798.

### 3.    August 16–21: Firefighters attempt to save life and property as the Chetco Effect Wind event causes explosive fire growth.

As the fire burned into August, hotter and drier weather created conditions for more active fire behavior in the third phase of the fire. August 2017 was the warmest month on record for parts of Oregon. Southwestern Oregon can experience offshore downslope winds locally known as the Chetco Effect. US_CHETCO_0069085. Like the better-known Santa Ana and Diablo winds in California, "[t]hese winds result in a reversal in temperature and humidity gradients across the region from typical maritime air with high relative humidity and moderate temperature with prevailing westerly flow (or winds) to low relative humidity with high temperatures with a prevailing northeastern flow (or winds)." Abatzoglou Report at 9 (Exhibit 3); US_CHETCO_0069085. "Downslope winds like the Chetco Effect are a notorious critical fire weather pattern, as they bring locally strong winds, anomalously dry air, and often warm temperatures that favor rapid rates of fire spread where fuels remain available." Abatzoglou Report at 9. The Forest Service was aware of the potential for such winds, as fire behavior modeling and the July 2017 long-term assessment showed the potential for these winds to increase fire behavior dramatically by mid-August. US_CHETCO_0055489 (Exhibit 4).

The Chetco Effect winds first occurred on the evening of August 15 and morning of August 16 and lasted through August 20th. Abatzoglou Report at 17. While the August 2017 Chetco Effect was not the strongest offshore winds seen in the period of record, the combination of low humidity, dry fuels, and strong winds over several days was historically rare. *Id.* The winds "caused embers to fly far ahead of the fire during this time, creating spot fires 1 to 2 miles or more ahead of the main flame front." US_CHETCO_0069087. These conditions allowed for an expanding fire front that led to significant growth of the fire during this period. Abatzoglou Report at 21. Over just four days, the Chetco Bar Fire increased more than tenfold in size from

7

8,500 acres on August 17 to 91,551 acres on August 21. US_CHETCO_0069085; Finney Report at 14–23 (Exhibit 5); August 17–22 Fire Progression Maps (Exhibit 6).

When the Chetco Winds started, the fire remained north of the Chetco River. US_CHETCO_0069085. When the winds returned the evening of August 16 and morning of August 17, the fire crossed the Chetco River, which until that point had acted as a natural barrier. US_CHETCO_0069085. As the Chetco Effect progressed, the Incident Management Team "found itself struggling to catch up." US_CHETCO_0047954 (Exhibit 7). The fire expanded rapidly, due in part because heavy vegetation on the south side of the river fueled the fire under the winds. US_CHETCO_0069085. Once the fire crossed the river, the Incident Management team began plans to conduct a firing operation to stop the southern-spread of the fire using the contingency line constructed on the 1917 road. That evening, the Incident Commander Bob Houseman issued an evening update notifying the public fire crews would begin using "strategic firing operations as part of their planned suppression strategy starting as early as tonight" US_CHETCO_0047860 (Exhibit 8). The prepped containment line ran along Forest Service road 1917. *Id.* The press release noted that "air tankers dropped retardant around Quail Peak Lookout and along fires edge to help slow its progression." *Id.*

The next morning, however, the team found that the prepped contingency line they planned to use had been breached, making their plan "no longer valid." U.S. Teutrine Tr. 42:1–4 (Exhibit 9). The Chetco Effect winds caused the fire to make a run overnight and the fire "significantly crossed" Forest Service road 1917 before the Forest Service could conduct the planned burnouts. *Id.*; US_CHETCO_0047954; US_CHETCO_0069087. Fire crews therefore did not conduct the burnout operation announced the night before. Houseman Tr. 92:17–19 (Q: "Were those contemplated firing operations ever executed?" A: "No, I don't believe they were.")

8

(Exhibit 10); U.S. Teutrine Tr. 39:21–23 (Q: "And were these intentions ever executed?" A: "They were not."). Faced with a contingency line that was breached and historic weather conditions causing extreme fire behavior and rapid growth, firefighters were forced to quickly adapt the response to protect life and property.



**Wilmore Report (Exhibit 11) at 12, Figure 7 (graphic showing fire had moved past contingency line)[1]**

Firefighters then prepared a burnout operation to save Packer's Cabin. After a test fire confirmed conditions, firing operations began around 10:30 am "from the main fire edge" where the fire had burned the previous night. US_CHETCO_0047946; US_CHETCO_0056474. At the

---

[1] In Figure 7 from the expert report of Brenda Wilmore, the red outline shows the fire perimeter and the orange color inside the perimeter indicates the presence of intense heat as mapped on August 17 at 11:00pm. The yellow circles indicate heat detected on August 18 at 2:48 am and 4:48am. The heat signatures show that the fire had moved past the 1917 road that was the contingency line and south of Packer's Cabin more than six hours before initiation of the Packer's Cabin firing operation. *Id.*

start, winds were favorable for a controlled burnout. US_CHETCO_0047947. Around 11:40,

however, the inversion lifted and winds shifted uphill. *Id.* A spot fire crossed to the north side of

Road 1917. *Id.* Conditions then deteriorated rapidly. A "distinct roar" came up the hill from the

south, and fire streamed across Road 1917, cutting off the crew's egress back to the cabin. *Id.*

The crew was then directed to drive east down Road 1917 back toward where the firing

operation had started and into the black (the area the main fire previously burned).

US_CHETCO_00564754 (Exhibit 12); US_CHETCO_0047947. The crew reached the black

with no injuries and no equipment damage. US_CHETCO_0047947. Once the crew was safe, the

team remaining near Packer's Cabin continued the firing operation and moved out of the area.

US_CHETCO_0047948. Packer's Cabin did not burn.



**Wilmore Report at 16, Figure 10 (green line depicts approximate location of the firing operation)**

The massiveness of the main fire during the firing operation near Packer's Cabin was

apparent from the air. A helicopter pilot reported that "there was fire on both sides of the road

and expressed doubt in how successful burning off and holding the road would be." *Id.* From the

10

helicopter pilot's perspective, "it was just a matter of time before fire burned everything on both sides of the 1917 road"— regardless of whether any firing operations occurred. *Id.*

As the fire grew rapidly, the Incident Management Team directed firefighters to protect several structures and homes south of Packer's Cabin. Firefighters conducted two firing operations on August 19 and 20 around the Chetco River Inn and the Wilderness Retreat that were "likely instrumental in saving the houses and structures at the Gardner Ranch, the Chetco River Inn and in the Wilderness Retreat vicinity." CBMF_006052 (Exhibit 13). The first firing operation that occurred was around the Wilderness Retreat, a community of about 50 homes. US_CHETCO_0069087. Firefighters used a combination of handlines and skid roads as a containment line around the homes. Gibilisco Tr. 21:7–11 (Exhibit 14). The main fire was within 20 to 30 feet of the containment lines when the firing operations began. Blofsky Tr. 61:11–15 (Exhibit 15). The firing operation to save the homes started around sundown and continued throughout the night until sunrise. Gibilisco Tr. 25:9–11. "All structures in the area survived the fire." CBMF_006051.

The second firing operation in this area was around the Chetco River Inn. Crews cleared brush and prepared a line as the fire was "heading straight towards Chetco Inn" with "pretty good intensity." U.S. Teutrine Tr. 62:16–17. The control line was constructed from the river around the east of the Chetco River Inn, connecting to the driveway and forest service road. *Id.* at 78:17–23. Crews conducted the firing operation the afternoon of August 20. Corso Tr. at 44:13–14 (Exhibit 16); Brod Tr. 59:6–8 (Exhibit 17). The main fire was progressing on the west side of the Chetco River during the firing operation. Brod Tr. 75:13–23. The firing operation moved to the north towards the main fire. Corso Tr. 67:17–19; Brod Tr. 66:14–16, 21–23. The firing operation successfully protected the Chetco River Inn. Brod Tr. 70:20–22.

11



**Wilmore Report at 24, Figure 15 (green line depicts approximate location of the firing operations)**

The rapid and uncontrollable growth of the fire during the Chetco Effect Winds led to an official emergency proclamation. At 12:26 a.m. on August 20, Governor Kate Brown invoked the Emergency Conflagration Act of 1940. Executive Order No. 17-18 (Exhibit 18); *see also* US_CHETCO_0056800; Or. Rev. Stat. §§ 476.510–610. The Act allows the State Fire Marshall to mobilize firefighters and equipment from around the state. US_CHETCO_0056800; Or. Rev. Stat. § 476.520. The Act is only used for fires that involve or threaten life and structures. US_CHETCO_0056800. Governor Brown invoked the act because she determined that "a threat to life, safety, and property" existed because of the Chetco Bar Fire. Executive Order No. 17-18.

> 4.      **August 21 – November 2: Firefighting response continues through November until the fire is contained.**

The Chetco Bar Fire continued to burn actively through the end of August and into September 2017. US_CHETCO_0069089. High temperatures and low humidity contributed to the fire growing from 97,758 acres on August 22 to 191,067 acres on September 22. *Id.*

12

Firefighters gained substantial control of the fire, going from 0 percent containment on August 22 to 97 percent containment by September 22. US_CHETCO_0069091. In mid- to late-September, the weather started to change, with cooler days and more moisture, which helped to moderate the fire's behavior. *Id.* By September 23, the area had received several inches of rain, which nearly contained the fire. *Id.* The fire was declared fully contained on November 2. *Id.* The Chetco Bar Fire burned a total of approximately 191,197 acres. *Id.*

### B.      Post Fire Reports

In the aftermath of the Chetco Bar Fire, the United States completed two reports to evaluate its response. First, the Forest Service conducted a Facilitated Learning Analysis to evaluate the "near miss" incident during the Forest Service's operations near Packer's Cabin. US_CHETCO_0047944–60. Though the Facilitated Learning Analysis was prompted by the Packer's Cabin incident, it examined the Forest Service's response to the fire through August 24, 2017. US_CHETCO_0047959. The Facilitated Learning Analysis does not indicate that firing operations or planned ignitions were the cause of any damage to public or private land. To the contrary, the Facilitated Learning Analysis underscored the rapidly changing conditions, particularly when the Chetco Effect was present in mid-August. US_CHETCO_0047954.

Second, members of Congress asked the Government Accountability Office (GAO) to review the Forest Service's response to and the effects of the fire. US_CHETCO_0069060–125. The GAO reviewed federal documents related to key events, analyzed reports and effects of the fire, visited the burned areas, and interviewed Forest Service, state, and local officials involved in the response as well as other stakeholders, such as community members and representatives of non-governmental organizations. US_CHETCO_0069061; *see* US_CHETCO_0069065–68. The GAO completed its report in April 2020. The GAO report does not indicate that firing operations

13

or planned ignitions were the cause of any damage to public or private land. To the contrary, the GAO report found that "Chetco Effect winds caused the fire to move rapidly toward and past the fireline before the Forest Service could conduct the planned burnouts." US_CHETCO_0069087.

South Coast Lumber, the parent company of Plaintiffs Chetco Resources and Pistol Resources, commissioned its own report about the firing operations on August 19 near Chetco River Inn and Wilderness retreat. CBMF_006049–73. The report's author Dan Shults, a retired Oregon Department of Forestry forester, was asked to "[i]nvestigate, review and document what occurred during the reported backfire on South Coast Lumber Co. ownership on August 19, 2017; a day of significant growth of the Chetco Bar Fire." CBMF_006049. One of the "key questions" for the report was:

> Did South Coast Lumber Co. forestlands burn as a result of the progression of the Chetco Bar Fire on August 19 and the ensuing 24 to 48 hours or due, at least in part, to burning resulting from a backfire ignited in an effort to stop the advance of the main fire and save structures in the vicinity?

*Id.* Shults concluded that spot fires from the main fire "and subsequent spread from the main fire over the next 24 to 48 hours, resulted in the loss of the South Coast Lumber Co. reproduction and second growth timber." CBMF_6052. He noted that although the "backfire added additional fire to the landscape, [it] did not significantly effect the amount of land burned or the private forestland resources lost." *Id.*

### C.     Plaintiffs' Properties

There are four groups of Plaintiffs in this consolidated action: the Worltons, Brimms, Laursens, and two subsidiaries of South Coast Lumber, Chetco Resources, LLC and Pistol Resources, LLC. Chetco Compl. ¶¶ 4–6, Dkt No. 1; Worlton Compl. ¶¶ 4–8, *Worlton v. United States*, No. 1:22-cv-01569 (Fed. Cl. Oct. 21, 2022), Dkt. No. 1.

14

Cecilia Marie Worlton and William Layne Worlton own property west of the Chetco River and approximately 6 miles southwest of Packer's Cabin. The Worltons used their Property as a residence, to raise livestock for recreational amenities, and other recreational activities. Worlton Interrog. Resp. 6 (Exhibit 19). The Worltons lost their residence and personal property when their Property burned. Worlton Interrog. Resp. 8, 9.

Andrew L. Laursen and Shana A. Laursen, both individually as trustees of the Laursen Family Trust, own Property west of the Chetco River and approximately 4.5 miles southwest of Packer's Cabin. The Laursens used their Property as habitat for fish, for recreational amenities, and as a temporary residence for a recreational fishing retreat. Laursen Interrog. Resp. 6 (Exhibit 20). The Laursens lost their recreational residential cabin and curtilage and some personal property when their Property burned. Laursen Interrog. Resp. 8, 9.

Byron L. Brimm owns Property west of the Chetco River and approximately 5 miles southwest of Packer's Cabin. Mr. Brimm used the property as a residence for him and his wife Joyce Brimm and also as a habitat for fish, for recreational amenities and activities, and to raise cattle and merchantable timber. Brimm Interrog. Resp. 6 (Exhibit 21). No structures or personal property were lost when the Brimm Property burned. Brimm Interrog. Resp. 8, 9.

South Coast Lumber, through two wholly owned subsidiaries named Chetco Resources, LLC and Pistol Resources, LLC, owns Property east and west of the Chetco River and as close as 2.5 miles from Packer's Cabin. Chetco Resources and Pistol Resources used their land to grow merchantable timber. Chetco Interrog. Resp. 6 (Exhibit 22); Pistol Interrog. Resp. 6 (Exhibit 23). Some of Chetco Resources' and Pistol Resources' Property burned in the fire. No structures or personal property were lost. Chetco Interrog. Resp. 8, 9; Pistol Interrog. Resp. 8, 9.

15

## II.    Procedural History

The individual Plaintiffs (Worltons, Brimms, Laursens), and the South Coast Lumber subsidiaries (Chetco Resources, LLC and Pistol Resources, LLC) each filed complaints on October 21, 2022. *See* Worlton Compl., 1:22-cv-01569; Chetco Compl.

Plaintiffs bring claims under the Fifth Amendment for an alleged uncompensated taking of their property. They allege the Forest Service managed the Chetco Bar Fire to restore the natural role of fire to the landscape or for land management purposes, which led to a strategy of letting the fire burn their property. They also allege that the Forest Service conducted firing operations that spread to their properties.

At the parties' request, the Court consolidated the two lawsuits, and shortly after the United States answered the complaints. *See* Dkt. Nos. 9, 10, 11-1. The case is bifurcated into liability and valuation phases and is currently in the liability phase. Dkt. No. 21. For over two years, the parties engaged in extensive discovery. The parties exchanged nearly forty thousand documents and conducted over forty depositions. After the close of fact and expert discovery, the parties filed memorandums addressing the factual and legal issues in dispute, evidence and legal authority each side offers in support of its position, and the best and preferred means of resolving the dispute. Dkt. Nos. 35, 36. The Court then set the deadline for the United States to file the present motion and set a trial date for December 2026. Dkt. No. 37.

### STANDARD OF REVIEW

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party has the burden of showing "the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." *Crater Corp. v. Lucent*

16

*Techs., Inc.*, 255 F.3d 1361, 1366 (Fed. Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). The nonmoving party then bears the burden of establishing, by a showing of specific facts, that there are genuine issues of material fact for trial. *See Celotex*, 477 U.S. at 324–25. "A fact is material if it will make a difference in the result of a case under the governing law." *Kingman Reef Atoll Dev., LLC v. United States*, 116 Fed. Cl. 708, 742 (2014).

The failure of proof on an essential element of Plaintiffs' case is a proper basis for summary judgment. *Celotex*, 477 U.S. at 322–23. When a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial … there can be 'no genuine issue as to any material fact,' since a party's case necessarily renders all other facts immaterial." *Id.*; *see also Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) ("A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law.").

## ARGUMENT

The Court should grant the United States' motion for summary judgment on all of Plaintiffs' claims. First, Plaintiffs cannot establish causation under the correct legal standard, which requires showing that their properties would not have burned absent *all* government suppression efforts, not merely the firing operations in isolation. None of Plaintiffs' experts applied this standard for any of the firing operations in August, and Plaintiffs put forward no causation evidence at all for the firing operations in September. This failure of proof is fatal to all claims.

17

Second, partial summary judgment is warranted on Plaintiffs' theory that the Forest Service used the Chetco Bar Fire to pursue natural resource management objectives. That claim is contradicted by uncontested witness testimony and documentary evidence showing that the fire was, from start to finish, managed as a full suppression fire. Plaintiffs cannot create a material issue of fact through their misreading of the decision documents and forest management plans and strategies.

## I.      Plaintiffs cannot meet their burden to prove causation.

Plaintiffs cannot meet their burden to show causation because they apply the wrong standard and offer no viable evidence to show that their properties would not have burned had the government undertaken no suppression efforts whatsoever.

### A.      To prove causation, Plaintiffs must show that, absent the government fire suppression efforts, their properties would not have burned.

Causation is an essential element of any takings claim, and Plaintiffs bear the burden of proving it. *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018). And the Federal Circuit's standard is clear: "a plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." *Id.* Otherwise stated, the standard requires Plaintiffs to "establish what damage would have occurred without government action." *Id.* at 1363.

The same causation standard applies uniformly across all physical takings, no matter the natural force at issue. Courts have applied the standard to flooding, erosion, and fires alike. *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 981 (Fed. Cir. 2023) (flooding); *Applegate v. United States*, 35 Fed. Cl. 406, 417 (1996) (erosion); *McDonough Fam. Land, LP v. United States*, 172 Fed. Cl. 414, 425 (2024) (fire). The analysis does not vary based on the cause of the harm. Whatever the alleged cause, courts "'must consider the impact of the entirety of

18

government actions that address the relevant risk' by assessing whether the plaintiff's damage was greater than it would have been if the government had not acted to 'prevent[ ] the same type of injury on the same property where the damage occurred.'" *Bd. of Supervisors of Issaquena Cnty., Miss. v. United States*, 84 F.4th 1359, 1365–66 (Fed. Cir. 2023) (quoting *St. Bernard Par.*, 887 F.3d at 1364, 1366). That includes consideration of "actions by the government that might have *mitigated* damage to plaintiffs' properties." *Orr v. United States*, 166 Fed. Cl. 1, 51 (2023) (emphasis added) (citation modified).

Applied here, Plaintiffs "will have to show by preponderant evidence that—absent the firing operations *and other suppression efforts undertaken by the government*—their property would not have been taken." *McDonough Fam. Land*,  172 Fed. Cl. at 425 (emphasis added) (citing *St. Bernard Parish*, 887 F.3d at 1362). Under that standard, Plaintiffs' claims fail as a matter of law.

### B.    Summary judgment for the United States is required because Plaintiffs do not apply the correct causation standard.

The Court should grant summary judgment because Plaintiffs have offered no evidence capable of establishing causation under that correct standard. Their expert opinions ignore most of the government's response to the fire and thus answer a different and legally insufficient question.

The government's response to the Chetco Bar Fire was comprehensive. It included airtankers dropping a combined 30,823 gallons of retardant on the fire on August 17 alone. US_CHETCO_0069088. The next day, a helicopter dropped over 30,000 gallons of water on the wildfire. US_CHETCO_0048007 (Exhibit 24); US_CHETCO_0069088; *see also* U.S. Teutrine Tr. 33:24–25 (describing that the helicopter was "working on the main fire" on August 18, 2017). The response also included firefighters constructing fire breaks with heavy machinery and

19

handlines to stop or slow the fire's advance. *See* Wilmore Report at 17 (noting fire suppression actions, including "dozer line, retardant, bucket drops, firing operation"). As the fire expanded rapidly during the Chetco Effect Winds, those efforts, and specifically the firing operations, saved numerous structures, including occupied residences. *See* CBMF_006052 (finding the August 19 firing operations "were likely instrumental in saving the houses and structures at the Gardner Ranch, the Chetco River Inn and in the Wilderness Retreat vicinity"); Brod Tr. 70:17–22 (noting that on August 19 "the fire was growing rapidly" and that had the Chetco River Inn firing operation "not been done, I -- I feel the fire would've taken over that home."). The firing operations that occurred were one component of the response to the Chetco Bar Fire, not the whole of it.

Yet Plaintiffs' experts ignored everything but the firing operations. None of their retained experts has developed an opinion comparing actual fire damage against the damage that would have occurred had the government conducted *no* firefighting response at all. That is the comparison the law requires. By asking only whether the firing operations, in isolation, caused Plaintiffs' injuries, their experts "addressed the wrong question." *St. Bernard Par.*, 887 F.3d at 1364. Evidence that answers the wrong question cannot establish causation, and evidence that cannot establish causation cannot survive summary judgment. *Id.* at 1357. Because Plaintiffs have not alleged—let alone identified any evidence to prove—that their properties experienced more fire damage than they would have experienced if the Forest Service had conducted no suppression activities, summary judgment is warranted. *See id.* (reversing the judgment entered in favor of the plaintiffs for "failure of proof on a key legal issue" of causation).

The gap in Plaintiffs' proof is even more pronounced with respect to actions taken in September 2017. Rich Fairbanks is the only Plaintiffs' expert who considered data and formed

20

opinions about the firefighting operations in September 2017. But he formed no opinion as to whether Plaintiffs' properties would have burned absent all the firefighting operations in September 2017. Plaintiffs offer nothing to fill that void. The United States has identified three firing operations that occurred during September 2017, *see* U.S. Supp. Interrog. Resp. 3 (Exhibit 25), a fact that was confirmed by multiple witnesses. Plaintiffs fail to put forth any evidence to prove those firing operations were the but-for cause of their damage under the correct standard. Summary judgment is therefore independently warranted as to any takings claims arising from September 2017 operations.

No trial is necessary to resolve this case. Plaintiffs cannot meet their burden and summary judgment should be granted on that basis. A trial would merely confirm what the record already shows: the firing operations did not cause Plaintiffs' properties to burn, and they had little effect on the fire's path or scope, other than to save the structures the operations were intended to protect. Indeed, Plaintiffs' own commissioned report on the Chetco River Inn and Wilderness Retreat firing operations concluded that those operations did not affect the amount of timberland the main fire would have burned regardless and that the firing operations saved homes. CBMF_6052. Plaintiffs cannot square that conclusion with their theory of liability.

Plaintiffs' failure of proof on the key element of causation requires that summary judgment be granted in favor of the United States.

## C.    There is no exception to causation for "per se" takings.

Plaintiffs attempt to sidestep their evidentiary problem by arguing that causation is automatically established when a physical categorical taking is alleged—that "causation is established by the act of taking *per se*." Dkt. No. 35 at 15–17. That theory has no support in the law and must be rejected.

Causation is an essential element of every takings claim.  An alleged physical per se taking is no different. That is because the per se classification resolves the nature of the taking; it does not resolve the causation inquiry. At bottom, the United States is not liable for physical harms it did not cause.

The Federal Circuit in *Ideker Farms* confirms that principle. There, the court found the government action to be a physical per se taking. 71 F.4th at 981. The court then immediately proceeded in the very next section to assess whether the plaintiffs had shown causation. *Id.* at 981–82. That sequence is not incidental. It reflects that per se status is a threshold issue (concerning the nature of a claim) and is not a substitute for proof of causation. For that reason, the Federal Circuit did not relieve plaintiffs of their burden to show causation and still required proof that they would not have suffered the injury in a "but for world" in which the government had not acted. *Id.* Plaintiffs' theory here, if accepted, would exempt an entire category of claims from proving an essential element that courts have invariably imposed. Nothing in the case law supports that result. Indeed, there is "no persuasive basis for carving out an exception to the but-for standard of causation for per se physical takings." *McDonough Fam. Land*, 172 Fed. Cl. at 425.

Plaintiffs must prove causation. They cannot. Summary judgment should be granted.

## II.     Plaintiffs cannot show the United States managed the fire to achieve natural resource benefits.

The Court should also reject as a matter of law Plaintiffs' theory that the United States used the Chetco Bar Fire to achieve "natural resource benefit objectives" and thus effected a Fifth Amendment taking. That claim is factually unsupported and legally unsound.

The Chetco Bar Fire was a started by lightning—not the United States—in a rugged wilderness. No government liability arises from the failure to suppress such a naturally occurring

fire, regardless of the reason. Inaction cannot be the basis for liability under the Fifth Amendment. *See St. Bernard Par.*, 887 F.3d at 1361, 1368.

Nor is Plaintiffs' allegation that the United States used the fire to pursue or achieve "natural resource management objectives," Chetco Compl. ¶ 1; Worlton Compl. ¶ 1, factually supported. According to Plaintiffs, these objectives included a national strategy and plan to restore the natural role of fire to the landscape and reduce of hazardous wildfire fuel. Chetco Compl. ¶ 1; *see also id.* ¶¶ 10–28; Worlton Compl. ¶¶ 12–30; Dkt. No. 35 at 3–6. Plaintiffs' allegation is based on a misinterpretation of select documents that has no evidentiary support and is directly contradicted by uncontested evidence.

Multiple witnesses for the United States rejected Plaintiffs' unsubstantiated allegation. For example, Tina Lanier was the District Ranger for the Gold Beach Ranger District of the Rogue River-Siskiyou National Forest at the time of the Chetco Bar Fire. District Ranger Lanier testified that the Forest Service's objective was to suppress the fire. Lanier Tr. 116:9–10 (Exhibit 26) ("It says in all of our documents that this was a suppression fire."); 116:12–15 ("Every time we say it's a suppression fire, that automatically means we are not managing it for a resource benefit or use as a wildland fire or some of those other words that mean the same thing."). Any consideration to use the fire to achieve "management objectives" was rejected "almost immediately, within a couple of hours or even minutes of when we detected the fire." *Id.* at 116:20–21.

Bob Housman was the NIMO Incident Commander who oversaw fire strategy and suppression operations from July 30 to August 30, 2017. Mr. Housman testified that he was given authority to manage the fire as a suppression fire and that suppression fires are *not* used for resource benefits. Houseman Tr. 36:10–13.

23

Dana Skelly was a Fire Behavior Analyst and Long-Term Analyst for the Forest Service. Currently, Ms. Skelly serves as the regional hazardous fuels program manager for Region 6 of the Forest Service, which includes the Rogue River-Siskiyou National Forest. Ms. Skelly said Region 6 does not use wildfire to manage hazardous fuels and any such use would conflict with National Wildland Fire Policy. Skelly Tr. 11:20–21 (Exhibit 27) ("I am not aware of any plans or any forest plans that allow for such activity."); Skelly Tr. 12:13–16 ("[T]he discussion of accomplishing resource objectives with wildfire is no longer part of the National Wildland Fire Policy guidance.").

Jason McGovern, who has been with the Forest Service for more than 24 years and currently serves as the Regional Fuels Coordinator for the Forest Service, testified he "do[es] not recall a fire that was managed for resource benefit in my career." McGovern Tr. 65:24–25; 11:19–21 (Exhibit 28).

The United States, in a 30(b)(6) deposition, also testified that the Forest Service did not use the Chetco Bar Fire for resource management or benefits. U.S. Skelly Tr. 60:20 (Exhibit 29). There was never any intent to "manage the fire for anything other than full suppression and control." *Id.* at 61:10–12.

This witness testimony is uncontested.

Multiple documents also show that Plaintiffs' contention that the fire was used to achieve "resource benefits" has no evidentiary basis. For example, the Forest Service prepares "Incident Action Plans" to document objectives established by the incident commander or unified command and address tactics and support activities for the planned operational period, generally 12 to 24 hours. The earliest Incident Action Plans from mid-July 2017 state that the general control objectives for the fire were to "[b]e prepared to respond to local initial attack."

24

US_CHETCO_0043372 (July 15–20, 2017) (Exhibit 30). Incident Action Plans from a few weeks later state, "[t]he Chetco Bar Fire is being managed under a suppression strategy utilizing a mix of direct, indirect, and point protection tactics when and where there is a high probability of success and firefighter exposure is commensurate with the identified value at risk." US_CHETCO_0043578 (August 7–8, 2017) (Exhibit 31). The August 20, 2017 letter of direction to Bob Houseman, Incident Commander, provided full authority and responsibility for "managing fire suppression activities" and "to organize, manage and direct your assigned resources for safe, efficient, and effective suppression of the fire." US_CHETCO_0048193 (Exhibit 32).

The documentary evidence shows the fire was managed as a suppression fire, and not for achieving any resource benefits.

In Plaintiffs' post-discovery memorandum, they claim Forest Service documents state the two "strategic objectives" for the fire were "general forest" and "wilderness." Dkt. 35 at 3 (citing US_CHETCO_0048099); *id.* at 4 (citing US_CHETCO_0048116). Plaintiffs allege that based on those objectives, the Forest Service let the fire burn for wilderness values. *Id.* at 4. As the United States explained in its 30(b)(6) deposition, the "strategic objectives" are automatically populated from the relevant Forest Plan into the decision document for a fire. U.S. Skelly Tr. 68:8–12 (the "strategic objectives are taken from the forest plans as amended to ensure that decision makers are incorporating the legal requirements and desired conditions outlined in the forest plan into consideration on their decisions"); *Id.* 72:12–14 ("They're automatically populated into a WFDSS decision based on the planning area for a fire."). For the Chetco Bar Fire, the "general forest" and "wilderness" strategic objectives were *rejected*. *Id.* at 71:12–16 ("Q: So did – in

considering the strategic objectives list, were those considerations all rejected? A: that's correct.").

Plaintiffs' post-discovery memorandum also claims that the FACTS database included their lands as acres "treated by wildfire." The FACTS database codes acres burned by fire, whether by planned ignition (prescribed burn) or unplanned ignition (wildfire). McGovern Tr. 64:13–20. It does not record "treatments," as Plaintiffs believe. *Id.* at 65:23–24 ("It would just be acres burned."). Additionally, Plaintiffs' argument is based on a *draft* FACTS database of unknown provenance.[2] The United States testified that the database Plaintiffs cite was a "preliminary data poll, and not the final reporting numbers." U.S. Skelly Tr. 114:13–14. The final reported data "only occur[] at one point in time every year, a month after the fiscal year closes." *Id.* at 115:12–14. Interim data, such as the draft spreadsheet Plaintiffs rely on, "have not received any quality control review" and "are not official numbers." *Id.* 141:20–22, 166:10–12 ("I would give no credence to any spreadsheet or snapshot taken outside of those annual snapshots."). Non-forest system lands (*i.e.*, Plaintiffs' property) cannot be counted in the FACTS database because those lands are not under the forest plan. *Id.* at 145:16–18. The initial, preliminary data may have included non-forest system lands, but any out-of-policy acreage was removed after the close of the fiscal year and after quality control of the data. *Id.* at 145:19–22. The final FACTS database for fiscal year 2018 does not include Plaintiffs' acreage. US_CHETCO_079361; US Supp. Interrog. Resp. 5 (Exhibit 33). The United States did not

---

[2] Plaintiffs apparently obtained the preliminary data from the internet. *See* U.S. Skelly Tr. 115:6–8 ("Q: So the one that you pull up today on the Internet is inaccurate? A: It will absolutely be inaccurate."); *see also Id.* at 115:18–19 ("Q: Oh, gosh, why do you put information on the Internet that might not be accurate?"); *Id.* at 115:24–116:3 ("I guess I would clarify that and say it is accurate for the time and space that the data is retrieved. However, it may not reflect the official reporting numbers for the given fiscal year.").

include Plaintiffs' land at all, let alone recording Plaintiffs' land as "treated by wildfire." Nothing contradicts this fact.

There is no factual basis for Plaintiffs' assertions that the Forest Service intended to burn private property in accordance with its national policies. Plaintiffs identify the Forest Service's implementation of the National Cohesive Wildland Fire Management Strategy, CBMF_004448 (Exhibit 34), and USDA Forest Service Strategic Plan: FY 2015–2020, CBMF_5055 (Exhibit 35), as "precise actions" that effected a taking of their property. Chetco Supp. Interrog. Resp. 2 at 3–6 (Exhibit 36).  But their interpretations of these policies stretch their meaning beyond any permissible reading. For example, Plaintiffs quote and summarize the Plan as follows: "Using the latest tools, we decide…when and where to use fire to achieve our objectives for long-term ecosystem health and resilience' of lands regardless of ownership." Chetco Supp. Interrog. Resp. 2 at 4 (quoting CBMF_005055). Plaintiffs added the last clause regarding ownership, but "[n]either the words 'regardless of ownership,' nor their substance, are found anywhere in the National Plan." *Strawberry Water Users Ass'n v. United States*, No. 2:22-CV-00002-JNP-DAO, 2023 WL 2634333, at *8 (D. Utah Mar. 24, 2023), *aff'd*, 109 F.4th 1287 (10th Cir. 2024). Similarly, nothing in the National Strategy "urge[s] the federal government to let [wildfires] run wild" and burn private property. *Id.* at 9. This same argument—that the Forest Service "has implemented the Strategy and the Plan on a nationwide basis purposefully using reasonably anticipated natural wildfire, augmented by large-scale backfires, to burn private and nonfederal public lands and communities" Chetco Compl. ¶ 14—was strongly rejected recently in a Federal Tort Claims Act case. *Strawberry Water Users Ass'n*, 2023 WL 2634333, at *8–*9 (describing argument as "blatantly twisting the government's written policy statements to make the case that the Forest Service intended to burn non-National Forest lands"); *id.* at *9 (plaintiffs' counsel

27

"tortur[ed] the language of policy documents in an attempt to show that the United States wished to burn non-federal land"); *id.* (finding "no factual foundation" for the allegation that wildfire was used to achieve hazardous fuel reduction). The Court should likewise reject Plaintiffs' attempt to use the policy documents as a basis of their claims here.

There is no support for Plaintiffs' allegation that the United States used the Chetco Bar Fire to pursue or achieve "natural resource management objectives." The Court should grant partial summary judgment for the United States on this claim.

## CONCLUSION

For all these reasons, the Court should grant the United States' motion for summary judgment.

Dated: March 26, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Samuel R. Vice*
SAMUEL R. VICE (CA Bar No. 324687)
Trial Attorney
JOHN P. TUSTIN (TX Bar No. 24056458)
Senior Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 353-5540 (Vice)
(202) 598-3543 (Tustin)
email: samuel.vice@usdoj.gov
email: john.tustin@usdoj.gov

*Counsel of Record for the United States*

28